**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HERMINIA M. DOLEMBA<br>individually and on behalf of a class, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| HOME DEPOT U.S.A., INC., | )<br>) |
| Defendant. | ) |

## COMPLAINT – CLASS ACTION

## INTRODUCTION

1.      Plaintiff, Herminia M. Dolemba, brings this class action against Home Depot U.S.A., Inc. for its failure to secure and safeguard its customers' personal financial data.

2.       Beginning in or around April 2014, hackers utilizing malicious software accessed the point-of-sale systems at Home Depot U.S.A., Inc. locations throughout the United States and Canada and absconded with customers' debit and credit card information, as well as the city, state, and ZIP code of the specific location where the card was used. In early September 2014, this information was placed for sale on an underground website notorious for offering stolen card data.

3.      Defendant's security failures enabled the hackers to steal financial data from within Defendant's stores and subsequently make unauthorized purchases on customers' credit and debit cards and otherwise put Class members' financial information at serious and ongoing risk. The hackers continue to use the information they obtained as a result of Defendant's inadequate security to exploit and injure Class members across the United States..

4.      Home Depot U.S.A., Inc. failed to uncover and disclose the extent of the Security Breach and notify its affected customers of the Breach in a timely manner. By failing to provide adequate notice, Home Depot U.S.A., Inc. prevented Class members from protecting themselves from the Security Breach.

5.       Accordingly, Plaintiff, on behalf of herself and other members of the Class, asserts

1

claims for breach of implied contract and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* and seeks injunctive relief, declaratory relief, monetary damages, statutory damages, and all other relief as authorized in equity or by law.

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). In the aggregate, Plaintiff's claims and the claims of the other members of the Class exceed $5 million exclusive of interest and costs, and there are numerous class members who are citizens of States other than Defendant's state of citizenship.

7.      This Court has personal jurisdiction over Home Depot because Home Depot U.S.A., Inc. does business in the State of Illinois, such that Home Depot U.S.A., Inc. has significant continuous and pervasive contacts with the State of Illinois. Home Depot U.S.A., Inc. maintains numerous locations and employees in the State of Illinois, including multiple locations compromised in the Security Breach.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1301(a)(2), 1391(b)(2) and 1391(c)(2) as: a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this District, and Home Depot conducts substantial business in this District.

## PARTIES

9.      Herminia M. Dolemba is a citizen of the State of Illinois and this judicial District. Plaintiff made purchases with her debit card at Home Depot U.S.A., Inc. on May 5, 2014, June 2, 2014 and August 11, 2014. As a result, Plaintiff entered into an implied contract with Home Depot U.S.A., Inc. for the adequate protection of her credit card information and had her sensitive financial information exposed as a result of Defendant's inadequate security.

10.      Defendant Home Depot U.S.A., Inc. is a Delaware corporation headquartered at 2455 Paces Ferry Road Atlanta, Georgia 30339. Defendant operates retail stores throughout the United States, including Illinois locations where Plaintiffs' purchases were made.

## FACTUAL BACKGROUND

11.     Home Depot U.S.A., Inc. processes in-store debit and credit card payments for customer purchases.

12.     On September 2, 2014, Home Depot U.S.A., Inc.'s banking partners and law enforcement officials notified the retailer of a potential data breach involving the theft of its customers' credit card and debit card data (the "Security Breach").

13.     That same day, multiple banks began reporting evidence that Home Depot U.S.A., Inc. stores were the likely source of a massive batch of stolen card data that went on sale that morning at rescator.cc, the same underground cybercrime shop that sold millions of cards stolen in the 2013 attack on Target, Inc. According to security blogger Brian Krebs, a comparison of the ZIP code data between the unique ZIPs represented on the rescator site and those of the Home Depot stores revealed a staggering 99.4 percent overlap. *Http://krebsonsecurity.com/2014/09/data-nearly-all-u-s-home-depot-stores-hit/* (last visited September 9, 2014).

14.     To uncover further details, Defendant's forensics and security teams initiated an investigation in conjunction with outside IT security firms and the Secret Service. On September 8, 2014, Home Depot U.S.A., Inc. announced that its investigation had confirmed that customers' data was indeed compromised, and victims could include anyone who used a credit or debit card at *any* of the more than 2,200 Home Depot U.S.A., Inc. locations in the United States or Canada since April 2014. If even a majority of Defendant's U.S. and Canadian locations were affected, the Security Breach "could be many times larger" than the Target breach, where *40 million* credit and debit cards were stolen over a three-week period. *http://krebsonsecurity.com/2014/09/banks-credit-card-breach-at-home-depot.* In the six months preceding August 3, 2014, Home Depot recorded more than 750 million customer transactions. *http:// online.wsj.com/articles/home-depot-confirms*-data-breach-1410209720.

15.     The stolen card data being offered for sale on rescator.cc includes both the

information needed to fabricate counterfeit cards as well as the legitimate cardholder's full name and the city, state and ZIP of the Home Depot U.S.A., Inc. store from which the card was stolen. *Http://krebsonsecurity.com/2014/09/in-wake-of-confirmed-breach-at-home-depot-banks-see-spike-in-pin-debit card-fraud/* (last visited September 9, 2014). This location information allows cyber thieves to quickly and more accurately locate the Social Security number and date of birth of cardholders, further increasing the risk of identity theft (above and beyond fraudulent credit and/or debit card transactions) for affected Home Depot U.S.A., Inc. customers.

16.    Customers' social security and date of birth information have already been pilfered and are being used to change the PIN numbers on stolen debit cards and to make ATM withdrawals directly from customers' accounts. On September 8, 2014, one large, West Coast bank reported losing more than $300,000 in two hours to PIN fraud on multiple debit cards that had all recently been used at Home Depot U.S.A., Inc. Other financial institutions have reported a steep increase in fraudulent ATM withdrawals on customer accounts in the week since the Security Breach was first reported.

17.    The security breach was caused and enabled by Defendant's knowing violation of its obligations to abide by best practices and industry standards in protecting customers' personal information. Home Depot U.S.A., Inc. grossly failed to comply with security standards and allowed its customers' financial information to be compromised, all in an effort to save money by cutting corners on security measures that could have prevented or mitigated the Security Breach that occurred.

18.    In this regard, the software used in the attack was a variant of "BlackPOS," a malware strain designed to siphon data from cards when they are swiped at infected point-of-sale systems. *http://krebsonsecurity.com/2014/09/home-depot-hit-by-same-malware-as-target/* (last visited September 9, 2014). Hackers had previously utilized BlackPOS in other recent cyber attacks, including last year's breach at Target. While many retailers, banks and card companies have responded to these recent breaches by adopting the use of microchips in U.S. credit and debit cards,

4

technology that helps makes transactions more secure, Home Depot U.S.A., Inc. did not. In light of the breach, however, it has now announced that it plans to have chip-enabled checkout terminals at all of its U.S. stores by the end of 2104. Http://money.msn.com/business-news/article.aspx?feed=AP&date=20140909&id=17914998&ocid=ansmony 11(last visited September 9, 2014)

19.     Defendant's failure to comply with reasonable security standards provided Home Depot U.S.A., Inc. with short-term and fleeting benefits in the form of saving on the costs of compliance, but at the expense and to the severe detriment of its own customers - including Class members here - who have been subject to the Security Breach or otherwise have had their financial information placed at serious and ongoing risk.

20.     Home Depot U.S.A., Inc. allowed widespread and systematic theft of its customers' financial information. Defendant's actions did not come close to meeting the standards of commercially reasonable steps that should be taken to protect customers' financial information.

### *Security Breaches Lead to Identity Theft*

21.     The United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report") that identity thieves use personal identifying information ("PII") to open financial accounts, receive government benefits, and incur charges and credit in a person's name. See *http:///www.gao.gov/new.items/d07737.pdf.* As the GAO Report states, this type of identity theft is the most harmful because it may take some time for the victim to become aware of the theft and can adversely impact the victim's credit rating. In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records ... [and their] good name."

22.     According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation, and can take time, money, and patience to resolve. *See Taking Charge, What to Do If Your Identity is Stolen,* FTC, 3 (2012), *http://www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf* (last visited September 9, 2014).

Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

23.     A person whose PII has been compromised may not see any signs of identity theft *for years.* According to the GAO Report:

> **[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.**

24.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for a number of years. As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen credit card numbers and other PII directly on various Internet websites, making the information publicly available, just as they have done here. Companies, in fact, also recognize PII as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market. Risk Assessment Tool, Norton 2010, *www.everyclickmatters.com/victim/assessment-tool.html. See also* T. Soma, ET AL, *Corporate Privacy Trend: The "Value " of Personally Identifiable Information ("PII") Equals the "Value" of FinancialAssets,* 15 Rich. J.L. & Tech. 11, at *3-4 (2009).

25.     The FTC has also recognized that consumer data is a new - and valuable - form of currency. In a recent FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point by observing:

> **Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis - and profit.** *Statement of FTC Commissioner PamelaJones Harbour* (Remarks Before FTC Exploring Privacy Roundtable), *http:// www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf* (last visited September 9, 2014).

6

26.     Recognizing the high value that consumers place on their PII, many companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information that they share - and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from the surrender of their PII. You Want My Personal Data? RewardMe for It, *http://www.nytimes.com/2010/07/18/business/18unboxed.html* (last visited September 9, 2014). This business has created a new market for the sale and purchase of this valuable data.  See supra, fn.9.

27.     Consumers place a high value not only on their PII, but also on the *privacy* of that data. Researchers have already begun to shed light on how much consumers value their data privacy - and the amount is considerable. Indeed, studies confirm that "when [retailers'] privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites." Hann et al., *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at http://www.comp.nus.edu.sg/-ipng/research/privacy.pdf* (last visited September 9, 2014); Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior,* 22(2) Information Systems Research 254, 254 (June 2011).

28.     When consumers were surveyed as to how much they valued their personal data in terms of its protection against improper access and unauthorized secondary use - two concerns at issue here - they valued the restriction of improper access to their data at between $11.33 and $16.58 per website, and prohibiting secondary use to between $7.98 and $11.68 per website.

29.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of that consumer's PII, like Home Depot U.S.A., Inc., has deprived that consumer of the full monetary value of the consumer's transaction with the company.

### *Damages Sustained By Plaintiff and the Class*

30.     A portion of the services purchased from Home Depot by Plaintiff and the Class

necessarily included compliance with industry-standard measures with respect to the collection and safeguarding of PII, including their credit and debit card information. Because Plaintiff and the Class were denied privacy protections that they paid for and were entitled to receive, Plaintiff and the Class incurred actual monetary damages in that they overpaid for the services purchased from Home Depot U.S.A., Inc.

31.     Plaintiff and the Class have suffered additional injury in fact and actual damages including monetary losses arising from unauthorized bank account withdrawals, fraudulent card payments, and/or related bank fees charged to their accounts.

32.     After the breach, Home Depot U.S.A., Inc., encouraged consumers to check their credit reports, place holds on their credit reports, and close any affected accounts. However fraudulent use of cards might not be apparent for years. Therefore, consumers must expend considerable time taking these precautions for years to come.

33.     Though Home Depot U.S.A., Inc., has offered one year of credit monitoring to affected customers, as security blogger Brian Krebs notes, "credit monitoring services will do nothing to protect consumers from fraud on existing financial accounts - such as credit and debit cards - and they're not great at stopping new account fraud committed in your name."

34.     As a result of these activities, Plaintiff and the Class suffered additional damages arising from the costs associated with identity theft and the increased risk of identity theft caused by Defendant's wrongful conduct, particularly given the incidents of actual misappropriation from Class members' financial accounts.

35.     Plaintiff and the Class suffered additional damages based on the opportunity cost and value of time that Plaintiff and the Class have been forced to expend to monitor their financial and bank accounts as a result of the Security Breach. Such damages also include the cost of obtaining replacement credit and debit cards.

## DEFENDANT'S COLLECTION OF PERSONALLY IDENTIFIABLE INFORMATION AND PAYMENT CARD DATA

8

36.     Defendant is an American home improvement and construction retail store. Millions of Americans regularly shop at Defendant's online and brick-and-mortar stores. Defendant is the largest home improvement retailer in the United States, and the fourth largest domestic retailer by revenue.

37.     When individuals transact business with Defendant, or simply visit one of its stores or website, Defendant collects a wide variety of Personally Identifiable Information (PII) and Payment Card Data ("PCD") about them.

38.     Defendant discloses the Information it collects about individuals who either shop online or in stores - or simply enter any of its stores or browse its website, even without making a purchase - on its website:

Information We Collect

Contact information

We may collect the names and user names of our customers and other visitors. Additionally, we may collect your purchase history, billing and shipping addresses, phone numbers, email addresses, and other digital contact information. We may also collect information that you provide us about others.

Payment information

When you make a purchase we collect your payment information, including information from your credit or debit card, check, PayPal account or gift card. If you apply for a The Home Depot credit card or a home improvement loan, we might collect information related to your application.

Returns information

When you return a product to our stores or request a refund or exchange, we may collect information from you and ask you to provide your government issued ID. We use the information we collect from you and capture off of your government issued ID to help prevent fraud. To learn more about our Returns Policy, click here.

Demographic information

We may collect information about products or services you like, reviews you submit, or where you shop. We might also collect information like your age or gender.

Location information

If you use our mobile websites or applications, we may collect location data obtained from your mobile device's GPS. If you use our websites, we may collect location data

9

obtained from your IP address. We use this location data to find our nearest store to you, product availability at our stores near you and driving directions to our stores.

Other information

If you use our websites, we may collect information about the browser you are using. We might track the pages you visit, look at what website you came from, or what website you visit when you leave us. We collect this information using the tracking tools described here. To control those tools, please read the Your Privacy Preferences section.
<http://www.homedepot.com/c/Privacy_Security> (hyperlinks omitted)

39.     Thus, Defendant stores massive amounts of PII and PCD on its servers and utilizes this information to maximize its profits through predictive marketing and other marketing techniques.

### IMPORTANCE OF DATA SECURITY TO PURCHASING DECISIONS

40.     Consumers place value in data privacy and security, and they consider it when making purchasing decisions. Plaintiff would not have made purchases at Home Depot U.S.A., Inc., or would not have paid as much for them, had they known that Home Depot does not take all necessary precautions to secure their personal and financial data. Home Depot failed to disclose its negligent and insufficient data security practices and consumers relied on this omission to make purchases at Home Depot U.S.A., Inc.

41.     Furthermore, when consumers purchase goods at a national retailer, such as Home Depot U.S.A., Inc., they assume that its data security practices and policies are state of the art and that the retailer will use part of the purchase price that consumers pay for such state of the art practices. Consumers thus enter into an implied contract with Defendant that Defendant will adequately secure and protect their Private Information, and will use part of the purchase price of the goods to pay for adequate data security measures. In fact, rather than use those moneys to implement adequate data security policies and procedures, Home Depot failed to provide reasonable security measures, thereby breaching its implied contract with Plaintiffs.

### LACK OF SEGREGATION OF CARD HOLDER DATA FROM PII

42.     Unlike PII data, payment card data is heavily regulated. The Payment Card

10

Industry Data Security Standard (PCI DSS) is a set of requirements designed to ensure that companies maintain consumer credit and debit card information in a secure environment.

43.      "PCI DSS provides a baseline of technical and operational requirements designed to protect cardholder data." PCI DSS v. 2 at 5 (2010) (hereafter PCI Version 2).

44.      One PCI requirement is to protect stored cardholder data. Cardholder data includes Primary Account Number, Cardholder Name, Expiration Date, and Service Code. Id. at 7.

45.      "Network segmentation of, or isolating (segmenting), the cardholder data environment from the remainder of an entity's network is not a PCI DSS requirement." Id. at 10. However, segregation is recommended because among other reasons, "[i]t's not just cardholder data that's important; criminals are also after personally identifiable information (PII) and corporate data." See Verizon Report at 54.

46.      Illicitly obtained PII and PCI, sometimes aggregated from different data breaches, is sold on the black market, including on websites, as a product at a set price. See, e.g., <http://krebsonsecurity.com/2011/11/how-much-is-your-identity-worth> (last visited Sept. 9, 2014).

### COUNT I- BREACH OF IMPLIED CONTRACT

47.      Plaintiff incorporates paragraphs 1-46.

48.      Customers who intended to make purchases at Defendant's retail locations with debit or credit cards were required to provide their card's magnetic strip data for payment verification.

49.      In providing such financial data, Plaintiff and the other members of the Class entered into an implied contract with Home Depot U.S.A., Inc., whereby Home Depot U.S.A., Inc., became obligated to reasonably safeguard Plaintiff's and the other Class members' sensitive, non-public information.

50.      Plaintiff and the Class members would not have entrusted their private and

11

confidential financial and personal information to Defendant in the absence of such an implied contract.

51.     Home Depot U.S.A., Inc., breached the implied contract with Plaintiff and the other members of the Class by failing to take reasonable measures to safeguard their financial data.

52.     Plaintiff and the other Class members suffered and will continue to suffer damages including but not limited to loss of their financial information and loss of money and costs incurred as a result of increased risk of identity theft, all of which have ascertainable value to be proven at trial.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this claim pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class of all persons or entities anywhere in the United States, who made purchases at stores owned or operated by defendant between April 2014 and August 2014, using a credit or debit card.

54.     The exact number of class members and their identities are unknown at this time. However, since defendant has over 1,000 stores, the class members are so numerous that joinder of all individual class members is impracticable.

55.     Questions of law and fact common to all class members predominate over any questions affecting only individual members, including the following:

a.     Whether defendant breached implied contracts with class members by failing properly to safeguard their private and confidential financial and personal data.  *See Anderson v. Hannaford Bros. Co.*, 659 F.3d 151 (1st Cir. 2011).

b.     Whether defendant should compensate plaintiff and class members for damages for the increased risk of future harm and costs expended to mitigate harm.  *See Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 163 (1st Cir. 2011).

12

56.     Plaintiff's claims are typical of the claims of all class members, because all such claims arise from the same set of facts regarding defendant's breach of implied contract and its failures to protect plaintiff and class members private and confidential financial and personal data during 2014.

57.     Plaintiff is committed to the vigorous prosecution of this action and have retained counsel with class action experience for the prosecution of this case.

58.     Plaintiff have no interest that is antagonistic to the interests of other class members.

59.     This class action is superior to other available methods for fairly and efficiently adjudicating class members' claims because:

a.      The class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation, while also providing redress for claims that may be too small to support the expense of individual cases;

b.      The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications, which could establish incompatible standards of conduct for the defendant or allow some class member's claims to affect adversely other class members abilities to protect their interests.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and in favor of the class and against Home Depot U.S.A., Inc., as follows:

a.      Actual damages;

b.      Credit card monitoring services for Plaintiff and the other members of the Class;

c.      Punitive damages;

d.      Costs;

13

e.      Such other and further relief as may be just and proper.

## COUNT II-VIOLATION OF THE ILLINOIS
## CONSUMER FRAUD DECEPTIVE BUSINESS PRACTICES ACT

60.      Plaintiff incorporates paragraphs 1-46.

61.      Plaintiff and the other members of the Class were deceived by Defendant's failure to properly implement adequate, commercially reasonable security measures to protect their private financial information while shopping at Home Depot.

62.      Home Depot U.S.A., Inc., intended for Plaintiff and the other members of the Class to rely on Home Depot U.S.A., Inc., to protect the information furnished to it in connection with their debit and credit card transactions in such manner that the transactions would be protected, secure, and not susceptible to access from unauthorized third parties.

63.      Home Depot U.S.A., Inc., instead handled Plaintiff's and the other Class members' personal information in such manner that it was compromised.

64.      Home Depot U.S.A., Inc.,  failed to follow industry best practices concerning data theft  or was negligent in preventing such data theft from occurring.

65.      It was foreseeable that Defendant's willful indifference or negligent course of conduct in handling its customers' personal information would put that information at risk of compromise by data thieves.

66.      Home Depot U.S.A., Inc., benefited from mishandling its customers' personal information because, by not taking preventative measures that would have prevented the data from being compromised, Home Depot U.S.A., Inc., saved on the cost of those security measures.

67.      Defendant's fraudulent and deceptive acts and omissions were intended to induce Plaintiff's and the other Class members' reliance on Defendant's deception that their financial information was secure and protected when using debit and credit cards to shop at Home Depot U.S.A., Inc.

68.      Home Depot U.S.A., Inc., violated 815 ILCS 505/2 by failing to properly implement

14

adequate, commercially reasonable security measures to protect Plaintiff's and the other Class members' private financial information, by failing to warn shoppers that their information was at risk, and by failing to discover and immediately notify affected customers of the nature and extent of the security breach.

69. Defendant's acts or practice of failing to employ reasonable and appropriate security measures to protect consumers' personal information constitute violations of the Federal Trade Commission Act,15 U.S.C.§45(a).

70. Defendant's conduct constitutes unfair acts or practices as defined in that statute because Home Depot U.S.A., Inc., caused substantial injury to Class members that is not offset by countervailing benefits to consumers or competition and is not reasonably avoidable by consumers.

71. In addition, Home Depot U.S.A., Inc., also engaged in an unlawful practice by failing to comply with 815 ILCS 530/10(a), which provides:

> **Sec. 10. Notice of Breach. (a) Any data collector that owns or licenses personal information concerning an Illinois resident shall notify the resident at no charge that there has been a breach of the security of the system data following discovery or notification of the breach. The disclosure notification shall be made in the most expedient time possible and without unreasonable delay, consistent with any measures necessary to determine the scope of the breach and restore the reasonable integrity, security, and confidentiality of the data system**

72. 815 ILCS 530/20 provides that a violation of 815 ILCS 530/10 "constitutes an unlawful practice under the Consumer Fraud and Deceptive Business Practices Act."

73. Plaintiff and the other members have suffered injury in fact and actual damages including lost money and property as a result of Defendant's violations of 815 ILCS 505/2.

74. Plaintiffs and the other Class members' injuries were proximately caused by Defendant's fraudulent and deceptive behavior, which was conducted with reckless indifference toward the rights of others, such that an award of punitive damages is appropriate.

75. By this conduct, Home Depot U.S.A., Inc., violated the substantive consumer

protection and unfair deceptive trade practices acts or statutes of the Consumer Fraud States, whose laws do not materially differ from that of Illinois, or conflict with each other for purposes of this action.

## CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this claim pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class of all persons or entities, who made purchases at Illinois stores owned or operated by defendant between April 2014 and August 2014, using a credit or debit card.

77.     The exact number of class members and their identities are unknown at this time. However, since defendant has over 50 stores in Illinois, the class members are so numerous that joinder of all individual class members is impracticable.

78.     Questions of law and fact common to all class members predominate over any questions affecting only individual members, including the following:

> a.     Whether defendant breached implied contracts with class members by failing properly to safeguard their private and confidential financial and personal data.  *See Anderson v. Hannaford Bros. Co*., 659 F.3d 151 (1st Cir. 2011).

> b.     Whether defendant should compensate plaintiff and class members for damages for the increased risk of future harm and costs expended to mitigate harm.  *See Anderson v. Hannaford Bros. Co*., 659 F.3d 151, 163 (1st Cir. 2011).

79.     Plaintiff's claims are typical of the claims of all class members, because all such claims arise from the same set of facts regarding defendant's breach of implied contract and its failures to protect plaintiff and class members private and confidential financial and personal data during 2014.

80.     Plaintiff is committed to the vigorous prosecution of this action and have retained counsel with class action experience for the prosecution of this case.

81. Plaintiff have no interest that is antagonistic to the interests of other class members.

82. This class action is superior to other available methods for fairly and efficiently adjudicating class members' claims because:

    a. The class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation, while also providing redress for claims that may be too small to support the expense of individual cases;

    b. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications, which could establish incompatible standards of conduct for the defendant or allow some class member's claims to affect adversely other class members abilities to protect their interests.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and in favor of the class and against Home Depot U.S.A., Inc., as follows:

    a. Actual damages to Plaintiff and the other members of the Class;

    b. Three years of credit card monitoring services for Plaintiff and the other members of the Class;

    c. Punitive damages;

    d. Attorneys' fees and litigation costs;

    e. Ordering such other and further relief as may be just and proper.

**COUNT III- VIOLATION OF THE ILLINOIS
PERSONAL INFORMATION ACT, 815 ILCS 530/1**

83. Plaintiffs incorporate the substantive allegations contained in paragraphs 1-46.

84. Plaintiff Dolemba brings this claim individually and on behalf of the Class members.

17

85.     The Illinois Personal Information Protection Act, 815 ILCS 530/1 ("PIPA"), requires data collectors who own personal information concerning an Illinois resident to notify the resident of a data breach "in the most expedient time possible and without unreasonable delay ...." 815 Ill. Comp. Stat. 530/10.

86.     Defendant is a data collector within the meaning of the PIPA.

87.     Defendant possessed Plaintiffs' and Class members' personal information, as defined by the PIPA.

88.     Defendant failed to notify Plaintiff Dolemba of the Data Breach in the most expedient time possible and without unreasonable delay.

89.     Defendant's failure to timely provide notice constitutes a violation of the PIPA and other relevant statutes.

90.     Plaintiff Dolemba, individually and on behalf of Illinois Class members, seek all remedies available under the PIPA, including an injunction to require Defendant's compliance with the PIPA.

## CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this claim pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class of all persons or entities, who made purchases at Illinois stores owned or operated by defendant between April 2014 and August 2014, using a credit or debit card.

92.     The exact number of class members and their identities are unknown at this time. However, since defendant has over 50 stores in Illinois, the class members are so numerous that joinder of all individual class members is impracticable.

93.     Questions of law and fact common to all class members predominate over any questions affecting only individual members, including the following:

    a.     Whether defendant breached implied contracts with class members by failing properly to safeguard their private and confidential financial and personal data.  *See Anderson v. Hannaford Bros. Co.*, 659 F.3d 151 (1st Cir. 2011).

    b.     Whether defendant should compensate plaintiff and class members

18

for damages for the increased risk of future harm and costs expended to mitigate harm. *See Anderson v. Hannaford Bros. Co.*, 659 F.3d 151, 163 (1st Cir. 2011).

94. Plaintiff's claims are typical of the claims of all class members, because all such claims arise from the same set of facts regarding defendant's breach of implied contract and its failures to protect plaintiff and class members private and confidential financial and personal data during 2014.

95. Plaintiff is committed to the vigorous prosecution of this action and have retained counsel with class action experience for the prosecution of this case.

96. Plaintiff have no interest that is antagonistic to the interests of other class members.

97. This class action is superior to other available methods for fairly and efficiently adjudicating class members' claims because:

    a. The class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation, while also providing redress for claims that may be too small to support the expense of individual cases;

    b. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications, which could establish incompatible standards of conduct for the defendant or allow some class member's claims to affect adversely other class members abilities to protect their interests.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and in favor of the class and against Home Depot, as follows:

    a. Actual damages to Plaintiff and the other members of the Class;

    b. Three years of credit card monitoring services for Plaintiff and the other members of the Class;

    c. To pay punitive damages;

    d. Attorneys' fees and litigation costs;

    e. Ordering such other and further relief as may be just and proper.

/s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-42500
(312) 419-0379 (FAX)

**JURY DEMAND**

Plaintiffs demand a trial by jury.

/s/Daniel A. Edelman
Daniel A. Edelman

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.   All rights relating to attorney's fees have been assigned to counsel.


/s/Daniel A. Edelman
Daniel A. Edelman


Daniel A. Edelman
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)